## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JUANITA WARD, et al.,

                Plaintiffs,

    v.

MOST HEALTH SERVICES, INC., et al.,

                Defendants.

Civil Action No. 06-4646

## OPINION

Pollak, J.                                        August 8, 2008

      Before the court is defendant Dr. Richard Levine's motion for summary judgment on plaintiffs' claims, as well as plaintiffs' response in opposition and defendant's reply. For the reasons stated below, the court will deny defendant's motion.

## I.

      Plaintiff Juanita Ward filed suit individually; as surviving spouse of her late husband Joseph Edward Ward IV; as next friend of the couple's minor children, Joseph and Keshia; and as executrix of her late husband's estate. The defendants are Most Health Services, Inc., Most Healthcare Systems, Inc. (collectively, "Most Health"), and Richard Barry Levine, M.D.

The facts are undisputed except where noted to the contrary.  The late Mr. Ward was an employee of a chemical plant in Georgia called Dow Reichhold Specialty Latex, LLC.  Mr. Ward worked at the company's plant in Chickamauga, Georgia.

Dow Reichhold was required by Occupational Health and Safety Administration ("OSHA") regulations to provide free annual physicals to employees exposed to certain levels of hazardous substances such as acrylonitrile.  *See* 29 C.F.R. § 1910.1045(n).  The OSHA regulations require that the physicals include "[a] 14- by 17-inch posteroanterior chest X-ray."  *Id*. § 1910.1045(n)(2)(iii).  Rather than providing the physicals only to those employees whose exposure levels triggered the OSHA requirements, Dow Reichhold provided physicals for all of its employees at the Chickamauga plant, including clerical, management, and executive employees.  Although defendant disputes plaintiffs' characterization of the examination as "required" for all employees, it is undisputed that Dow Reichhold automatically scheduled for all employees both annual physicals and post-physical meetings with a physician (at which meetings the employees would receive the results of their physicals).

Dow Reichhold engaged defendant Most Health to perform the physicals.  In 2003, the physicals took place over two days in a mobile truck parked on the Dow Reichhold premises.  Mr. Ward underwent various tests in Most Health's mobile truck on May 8, 2003, including a posteroanterior chest x-ray as well as tests of his blood pressure, vision, hearing, and pulmonary function.  The result of his chest x-ray, as reported to Mr. Ward

in the report he received from Most Health describing his test results, was:

> The chest in the single PA projection demonstrates the trachea, mediastinal structures and cardiac silhouette to be intact.  There is no evidence of acute infiltrate, congestion or acute pleural reaction.  No active disease in the chest is observed.  The osseous and soft tissue structures are intact.
> SUMMARY: No active disease.
> Current Classification: Normal.

Pl. Resp. Exh. A.  Like the other Dow Reichhold employees, Mr. Ward was given only this report of the radiologist's findings and was not given the original x-ray film that formed the basis of the report; the x-ray film itself was retained by Most Health.  A year later, on May 15, 2004, after Mr. Ward began to suffer symptoms of a lung problem, an x-ray revealed a suspicious mass.  Less than two months later, on July 8, 2004, Mr. Ward, age 39, a non-smoker, died of lung cancer.

The doctor who read Mr. Ward's 2003 x-ray and wrote the above-quoted report was defendant Dr. Levine.[1]  Dr. Levine is licensed to practice medicine in Pennsylvania, where his office and primary residence are located.[2]  Dr. Levine had a contract with Most Health to perform "B-readings" of x-rays, paid on a per-x-ray basis.  A "B-reader" is a

---

[1] Dr. Levine testified in his deposition that the words of the report (as reproduced by Most Health in its summary of Mr. Ward's results for his various medical tests) were all his own words, except for the final notation "Current Classification: Normal."

[2] Dr. Levine was also, for several months in 2003, licensed to practice medicine in New Jersey, and he occasionally received and read x-rays at his second home on the New Jersey shore (although he read Mr. Ward's x-ray in Pennsylvania).  Dr. Levine testified in his deposition that he briefly re-activated his New Jersey license because of an impending Pennsylvania medical malpractice insurance crisis; however, after the Pennsylvania problem was resolved, he let the New Jersey license lapse.

3

radiologist who is certified by the National Institute for Occupational Safety and Health to

read x-rays for signs of occupational dust and disease in the lungs.  After reading x-rays,

he would produce a report, which he would send to Most Health along with the original

x-rays.  Most Health is incorporated in Pennsylvania, but has its main office in Voorhees,

New Jersey.  Most Health would send batches of x-rays to Dr. Levine in Pennsylvania via

FedEx or courier.

The parties dispute whether Mr. Ward's 2003 x-ray displays any abnormalities that

Dr. Levine should have noted in his report — specifically, whether Dr. Levine missed

diagnosing Mr. Ward's lung cancer at an early stage.

In 2006, plaintiffs filed this action in federal court in the Northern District of

Georgia, alleging diversity jurisdiction and seeking damages from Most Health and Dr.

Levine for alleged injuries caused by Dr. Levine's "violat[ion of] the standard of care and

skill exercised by radiologists generally under the same conditions."  Compl. ¶ 28.

Plaintiffs' complaint asserts two claims, negligence and wrongful death.  Compl.

¶¶ 38–39.  The district court held that it did not have personal jurisdiction over Dr. Levine

and dismissed the claims against him without prejudice.  Upon plaintiffs' motion for

reconsideration, the court vacated the portion of its order dismissing the claims without

prejudice and transferred the case to the Eastern District of Pennsylvania pursuant to 28

U.S.C. § 1406(a).  The court found that transferring the case was "in the interest of

justice" because the statute of limitations on plaintiffs' claims had expired, and because

plaintiffs had not made an obvious error in filing suit against Dr. Levine in Georgia; the jurisdictional question was "a close one."

On April 11, 2007, this court denied Dr. Levine's motion to dismiss after hearing argument. *See* Docket No. 31. The court declined to decide on the pleadings the principal question discussed at that argument, namely, which state's law governs plaintiffs' claims.

## II.

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see IFC Interconsult, AG v. Safeguard Int'l Partners, L.L.C.*, 438 F.3d 298, 317 (3d Cir. 2006). A genuine issue of material fact exists where the jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over facts is material where it could affect the outcome of the case. *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003).

A party seeking the grant of summary judgment carries the initial burden of informing the district court of the basis for its motion and identifying the portions of the record that show that there is no genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986); *Belitskus*, 343 F.3d at 639. Where the non-moving party bears the

burden of proof — as is the case for all of the claims presently before this court — the

moving party must show that the non-moving party cannot support its case with the

evidence in the record.  *Celotex*, 477 U.S. at 325.  In rebuttal, the non-moving party must

then identify facts that create a genuine issue of dispute for trial.  Fed. R. Civ. P. 56(e);

*Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 112 (3d Cir. 1996).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge . . . . The evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Anderson*, 477 U.S. at 255.

### III.

Defendant Dr. Levine (hereinafter, "defendant") moves for summary judgment on

three grounds:

### A.

First and principally, defendant contends that he is entitled to summary judgment

because (1) Pennsylvania law governs the duty owed by defendant Levine to plaintiffs;

(2) under Pennsylvania law, a traditional doctor-patient relationship is an element of a

medical malpractice claim; and (3) the undisputed facts show that Mr. Ward and

defendant Levine did not have such a relationship.

When determining the applicable substantive law in a diversity action, this court

applies the choice-of-law principles of the forum state — here, Pennsylvania.  *Klaxon Co.*

*v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).[3]  Because different issues may be decided under different states' laws, the court performs a choice-of-law analysis for each issue with respect to which the choice of law is disputed.  *See Berg Chilling Systs., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006) (applying Pennsylvania law).[4]

Pennsylvania employs a "flexible,'interests/contacts' methodology" to decide the choice of law.  *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007).  The court must decide first, whether there is an actual conflict between the states' potentially applicable laws; second, whether the conflict is "true," meaning that each state's interests would be impaired by applying the other state's laws; and, third, if there is an actual, true conflict, "which state has the 'greater interest in the application of its law.'" *Id*. at 229-31 (quoting *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 702 (Pa. Super. Ct.

---

[3] This action was transferred on plaintiffs' motion from the Northern District of Georgia. If that transfer had been for the convenience of the parties, pursuant to 28 U.S.C. § 1404(a), this court would apply Georgia choice-of-law principles. *See Ferens v. John Deere Co.*, 494 U.S. 516, 528 (1990) ("Applying the transferor law would not give a plaintiff an opportunity to use a transfer to obtain a law that he could not obtain through his initial forum selection.").  However, "[w]hen cases have been transferred for improper venue, transferee courts generally apply the substantive law they would have applied had the action been brought there initially." *Lafferty v. St. Riel*, 495 F.3d 72, 77 (3d Cir. 2007) (citing Moore's Federal Practice, §§ 111.02[2][c], 111.38 (Matthew Bender 3d ed. 2006); 14D Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure: Jurisdiction § 3827 at 581 n.22 (West 2007)).

[4] The Third Circuit has recently acknowledged in an unpublished opinion that Pennsylvania courts have not explicitly addressed whether different issues in the same case may be decided under different states' laws; however, the Third Circuit has assumed that the Pennsylvania Supreme Court would follow this rule, given its "pronouncement in *Griffith* that Pennsylvania's choice of law analysis focuses on 'the policies and interests underlying the *particular issue* before the court.'" *Taylor v. Mooney Aircraft Corp.*, 265 Fed. Appx. 87, 91 (3d Cir. 2008) (quoting *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964); emphasis added in *Taylor*).

2000)).

At step one, an "actual conflict" exists where the potentially applicable substantive bodies of law differ materially.  "If there is no conflict, then the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply."  *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006).

The question presented is whether there is an actual conflict between New Jersey and Pennsylvania laws with respect to the duty of care (if any) owed by a physician to a patient under the circumstances presented in this case.  Defendant contends that Pennsylvania law should apply, and that under Pennsylvania law a traditional doctor-patient relationship is required to create a duty of care.  Defendant does not directly address whether there is an actual conflict between Pennsylvania and New Jersey law on this issue.  Instead, defendant skips to the third part of the inquiry and contends that New Jersey has insufficient contacts with and interest in the case for New Jersey law to apply.

In response, plaintiffs contend that there is no actual conflict between the laws of Pennsylvania and New Jersey, because, under either state's law, defendant "Dr. Levine owed a duty of professional care to Mr. Ward" because they had a doctor-patient relationship.  Pl. Resp. 16.  Plaintiffs concede, however, that if this court does not agree with plaintiffs' reading of a recent Pennsylvania case, "there exists a significant conflict in the potentially applicable substantive laws" of New Jersey and Pennsylvania.  In that

8

case, plaintiffs contend, New Jersey law should apply.[5]

Defendant does not dispute that, under New Jersey law, no traditional doctor-patient relationship is required to maintain a cause of action for negligence against a physician. "New Jersey has long recognized that a physician owes a duty of reasonable care to the nontraditional patient in the context of a third-party examination." *Reed v. Bojarski*, 764 A.2d 433, 441 (N.J. 2001). For instance, in *Rainier v. Frieman*, 682 A.2d 1220 (N.J. App. Div. 1996) — discussed at length with approval in *Reed* — an ophthalmologist who was retained by the Department of Labor to examine the plaintiff reported to the Department that the plaintiff's vision problems did not disable him from work; however, it was subsequently discovered that the plaintiff had a brain tumor in his optic chasm. The New Jersey Appellate Division reversed the trial court's summary judgment in favor of the defendant ophthalmologist, "having satisfied itself that there was 'nothing in the decisional law of this jurisdiction and, indeed, nothing in the common understanding of the community regarding medical professional standards that would immunize a physician from liability for a professionally unreasonable diagnosis to the substantial detriment of the examinee, even if the examination is made at the expense and behest of a third party.'" *Reed*, 764 A.2d at 442 (quoting *Ranier*, 682 A.2d at 1222).

Pennsylvania law on the issue is considerably less clear. It is settled in Pennsylvania that, "[i]n order to establish a prima facie case of malpractice, the plaintiff

---

[5] Because neither party argues that Georgia law should apply, the court will consider only Pennsylvania and New Jersey law in the conflicts analysis.

must establish (1) a duty owed by the physician to the patient, (2) a breach of duty from the physician to the patient, (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and (4) damages suffered by the patient that were a direct result of that harm." *Mitzelfelt v. Kamrin*, 584 A.2d 888, 891 (Pa. 1990); *accord Hightower-Warren v. Silk*, 698 A.2d 52, 54 (Pa. 1997).[6] Defendant would have this court follow a line of Superior Court cases holding that a traditional doctor-patient relationship is required in order to create a duty of care in a physician — that is, to fulfill the first element of the prima facie case.  However, the Pennsylvania Supreme Court has never ruled on this issue, and a recent opinion of that court — *Sharpe v. St. Luke's Hospital*, 821 A.2d 1215 (Pa. 2003) — suggests that its analysis would differ from the Superior Court cases.

The first in the line of cases relied upon by defendant is *Craddock v. Gross*, 504 A.2d 1300 (Pa. Super. Ct. 1986).  In *Craddock*, the plaintiff, who was out on disability leave for a back injury, underwent an examination at the behest of his employer's workers compensation insurance carrier.  The physician cleared the plaintiff for work.  Shortly after returning to work, the plaintiff severely re-injured his back and brought suit against the physician who cleared him for work.  Finding no controlling Pennsylvania precedent,

---

[6] As the court will discuss below with respect to a different ground on which defendant moves for summary judgment, in order to make out a prima facie case, "[a] plaintiff is also required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered."  *Mitzelfelt*, 584 A.2d at 891.

the court followed cases from three other jurisdictions in holding that, in the absence of a "traditional doctor-patient relationship," the physician owed no duty of care to the plaintiff.  The requisite relationship was absent because the physician was paid by the insurance carrier and did not treat or advise the plaintiff.  *See id*. at 1302-3.

Following *Craddock*, in *Ervin v. American Guardian Life Assurance Co.*, 545 A.2d 354 (Pa. Super. Ct. 1988), the court held that a physician employed by an insurance company to examine the electrocardiogram of an applicant for insurance did not owe a duty to the applicant to discover or disclose abnormalities because the physician did not have a physician-patient relationship with the applicant.  The court, ruling on the basis of the pleadings, found "no averments in the instant complaint that the defendant physician acted for the benefit of anyone other than the insurance company" and stated that "[i]f the defendant physician breached any duty it was a duty owed to his employer," the insurance company.  *Id*. at 358.

In *Tomko v. Marks*, 602 A.2d 890 (Pa. Super. Ct. 1992), the plaintiff's employer paid for a pre-employment medical exam, including a chest x-ray.  The doctor who read the x-ray reported to the employer that it was normal.  Plaintiff was subsequently diagnosed with lung cancer and brought suit against the doctor who read the x-ray, alleging that the doctor had negligently misread the x-ray, resulting in a failure to diagnose the cancer earlier.  Characterizing *Craddock* and *Ervin* as holding that plaintiffs cannot "succeed on a cause of action in negligence" "for some omission on the part of the

11

physician" where "a third party sponsored a medical examination," the court held that plaintiff could not prevail because "'he did not employ the defendant, nor did he seek or receive medical advice or treatment.  Under such circumstances, the defendant did not owe plaintiff any duty arising from a physician patient relationship.'" *Id*. at 892 (quoting *Craddock*, 504 A2d at 1302; alteration omitted).

In *Promubol v. Hackett*, 686 A.2d 417 (Pa. Super. Ct. 1996), the court found no duty of care arising out of an x-ray taken in connection with an application for life insurance, where the patient received a copy of the x-ray and the physician's report.  The plaintiff — who herself was a physician specializing in obstetrics and gynecology — selected the physician who would perform the physical from a list provided by the life insurance company, and she received and reviewed a copy of the x-ray as well as the report of the physician who read the x-ray.  (It appeared that she received the copies only as a professional courtesy from the physician, whom she knew through her work; the insurance company did not provide them as a matter of course.)  The physician's report identified "a possibly calcified granuloma in the left upper lobe of the lung," the same area where cancer was diagnosed two years later.  Plaintiff did not take any action in response to the report of the possible calcified granuloma; like the doctor who reviewed the x-ray, she assumed it was the artifact of a prior infection.  *Id*. at 418 & n.4.  The Superior Court affirmed the trial court's holding that, under the above-cited line of cases, plaintiff could not maintain an action for negligence against the doctor who read the x-

12

ray, because the two did not have a traditional doctor-patient relationship.  The court

rejected the plaintiff's contention that a doctor-patient relationship was created where the

defendant physician sent plaintiff a copy of the x-ray and report, thus "gratuitously

rendering negligent advice."  *Id*. at 419.  Drawing on Black's Law Dictionary to define

"advice," the court found that the physician's x-ray report did not "advise" the plaintiff

because the report "was neither prepared for [her] nor directed to [her], and it did not

provide recommendations for follow-up."  *Id*. at 420.  Accordingly, there was no liability:

"'Pennsylvania courts have held that a patient may not succeed on an action in negligence

against a physician where a third party has sponsored the medical examination of the

patient. . . . Plaintiff did not employ the defendant nor did [s]he seek or receive medical

advice or treatment.  Under such circumstances, the defendant did not owe plaintiff any

duty arising from a physician-patient relationship.'"  *Id*. at 419-20 (quoting *Tomko*, 602

A.2d at 892).

Finally, in *Ney v. Axelrod*, 723 A.2d 719 (Pa. Super. Ct. 1999) — a case defendant

does not cite, perhaps because the Pennsylvania Supreme Court has since abrogated it in

*Sharpe*, discussed below — the Superior Court found no duty of care in the physician and

laboratory that processed the plaintiff's pre-employment drug test, which plaintiff alleged

came back with a false-positive.  Following *Tomko*, the court found that the plaintiff "did

not have the required physician-patient relationship based upon a therapeutic purpose,"

and the court was "not willing to create a theory of liability for negligent doctors or

13

medical laboratories that have contracted with third parties for employment-related

testing" because "[s]uch causes of action do not identify a substantial harm to an

identifiable and readily discernable class of plaintiffs such that we feel compelled to

create liability based on a public policy rationale." *Id*. at 721-22.

Plaintiffs contend that this line of Superior Court cases has been called into

question — if not entirely abrogated — by *Sharpe v. St. Luke's Hospital*, 821 A.2d 1215

(Pa. 2003) (unanimous opinion, with two justices not participating).  The facts of *Sharpe*

are similar to *Ney*: In *Sharpe*, the plaintiff was subjected to random drug testing by her

employer.  She was fired after testing positive for cocaine, a result that she alleged was

due to contamination of the sample by the hospital where she underwent the test.

Reversing summary judgment for the hospital, the court held that the hospital owed a duty

of reasonable care to the people whose samples were sent to the hospital for mandatory

employment-related drug testing.  *Id*. at 1215, 1219-21 & nn.2-3.  Undertaking an

analysis under *Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000), the *Sharpe* court found that

the plaintiff's being fired from her job for a false-positive cocaine test was a foreseeable

result of the hospital's alleged negligent mishandling of the blood sample; that the

hospital was the "entity in the best position to ensure the non-negligent collection and

handling of the specimen"; and that there was a "substantial public interest in insuring

that the medical facilities involved in [mandatory employment-related drug screening]

exercise a reasonable degree of care to avoid erroneous test results."  *Id*. at 1220-21; *cf.*

14

*Althaus*, 756 A.2d. at 1169 ("The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.").  As plaintiffs note, in coming to this conclusion, the court quoted with approval *Reed v. Bojarski*, 764 A.2d 433 (N.J. 2001) — one of the cases establishing potential liability against defendant under New Jersey law — for the proposition that "'[a] professionally unreasonable examination that is detrimental to the examinee is not immunized from liability because a third-party authorized or paid for the exam.'"  *Sharpe*, 821 A.2d at 1219 (quoting *Reed*, 764 A.2d at 442-43).

The *Sharpe* court criticized the analyses in *Tomko* and *Ney* on the ground that "in concluding that the defendants in *Tomko* and *Ney* owed no duty to the employees, the Superior Court focused solely upon the parties to a conventional physician-patient relationship and restricted its analysis to the absence of such a relationship, without due consideration of the other factors mentioned in *Althaus*."  *Sharpe*, 821 A.2d at 1220.  In a footnote, the court distinguished but did not explicitly endorse the results in *Ervin* and *Promubol*: "The scope of the obligations assumed by a physician under a contract with an insurance company, and the absence of affirmative conduct on the part of the physician that would itself result in direct harm to the examinee, . . . provide a basis for

15

distinguishing those Superior Court cases that have found the lack of a duty between the physician and the examinee." *Id*. at 1220 n.2.

With its criticism of *Tomko* and *Ney* in *Sharpe*, the Pennsylvania Supreme Court made clear that it would analyze a question of the character presented in the instant motion— that is, whether a physician in defendant Levine's position would owe a duty of reasonable care to a patient in Mr. Ward's position — by reference to the factors laid out in *Althaus*, rather than simply on the presence or absence of a conventional doctor-patient relationship.  To repeat, the *Althaus* factors are: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution."  756 A.2d. at 1169.[7]

First, with respect to the relationship between the parties, defendant contends that no traditional doctor-patient relationship existed because (1) Mr. Ward did not pay for the

---

[7] The court is bewildered by defendant's contention that *Sharpe* is irrelevant to this case because *Sharpe* was about the duty of a hospital rather than a physician.  Defendant's reply brief states that the *Sharpe* court "emphasized that a different outcome [than the one in *Sharpe*] resulted in physician cases like *Tomko* and the others, where 'the Superior Court focused solely on the physician-patient relationship and restricted its analysis to the absence of such a relationship . . . .'" Def. Reply 6-7 (quoting *Sharpe*, 821 A.2d at 1220).  This selective quotation fails to capture the sentence's meaning.  The *Sharpe* court did not endorse restricting the inquiry to whether a physician-patient relationship existed in cases where the defendant was a physician; to the contrary, the court criticized the lower courts for doing so.  Defendant's ellipsis omits a relevant portion of the sentence: "[I]n concluding that the defendants in *Tomko* and *Ney* owed no duty to the employees, the Superior Court focused solely upon the parties to a conventional physician-patient relationship and restricted its analysis to the absence of such a relationship, *without due consideration* of the other factors mentioned in *Althaus*."  *Sharpe*, 821 A.2d at 1220 (emphasis added).

16

services; (2) his employer paid for the services in order to comply with OSHA

requirements rather than for Mr. Ward's benefit; and (3) defendant never met Mr. Ward

and did not offer him medical advice.  Def. Mot. 15-17.  Plaintiffs respond that "the

relationship between Joseph Ward and Dr. Levine was exactly as one would expect

between a patient and radiologist" because "virtually all x-ray and pathology examinees

do not personally select their radiologists or pathologists; nor are they physically in the

presence of or examined by these physicians under any circumstances."  Pl. Resp. 15.

Plaintiffs contend that the x-ray was taken for Mr. Ward's benefit, and that, as his wife,

plaintiff Juanita Ward, testified in her deposition, Mr. Ward relied on his x-ray results for

reassurance that his lungs were not diseased.  Pl. Resp. 2-4.  The court notes that although

Dow Reichhold may have paid for the annual physicals in order to comply with OSHA

regulations, a plain purpose of OSHA's requiring the physicals was to protect employee

health.  The regulation requires the employer to "provide each such employee with an

opportunity for medical examinations and tests" and then ensure that the employee is

"informed by the physician of the results of the medical examination and any medical

conditions which require further examination or treatment."  29 C.F.R.

§§ 1910.1045(n)(1)(i), (6)(i)(D).  In this respect, the examination differs from the

insurance-related examinations in *Craddock*, *Ervin*, and *Promubol*, whose purposes were

to evaluate whether the employee was a good risk for an insurer or whether an employee

qualified for worker's compensation benefits.

17

With regard to the second *Althaus* factor, the social utility of the actor's conduct, the service being performed by defendant Levine — reading x-rays to monitor the pulmonary health of employees exposed to hazardous chemicals — holds unquestionable significance for public health.  Federal regulations required Mr. Ward's employer to provide annual physicals — including a chest x-ray — to employees exposed to hazardous chemicals present at the plant.  Defendant Levine was a certified B-reader trained specifically to detect occupational dust and disease in x-rays.  His review of Mr. Ward's x-ray was the only reading that the x-ray received at Most Health, and the original x-ray film was not transmitted to Dow Reichhold and its employees.  Negligent work by defendant Levine would fundamentally undermine the entire purpose of OSHA's requirement that employees exposed to dangerous chemicals receive annual chest x-rays.[8]

With respect to the third factor, the nature of the risk and foreseeability of harm arising from defendant's negligence, the grave risk to a patient's health posed by a careless reading of an x-ray is obvious.  Likewise, the consequent harm — the failure to diagnose lung disease at an early stage, thereby reducing the likelihood of successful treatment — is foreseeable.  In the words of defendant Levine, "If I break form, someone gets hurt."  Levine Dep., May 31, 2007, at 141.

With respect to the fourth and fifth factors, the consequences of imposing a duty

---

[8] It is not clear from the record before this court whether or to what extent Mr. Ward was exposed to the hazardous chemicals; as discussed above, his employer provided the examinations to all employees rather than only to those employees whose exposure levels triggered OSHA's medical surveillance requirements.

upon defendant and the overall public interest in doing so, defendant focuses on the

possible consequence that finding liability in Dr. Levine and other similarly situated

physicians will tend to increase the price of their malpractice insurance.  Defendant

contends that "consistent with current public policy, the Pennsylvania courts have been

steadfast in not increasing physician exposure to malpractice claims, declining to extend

the duty that a physician owes to its patient beyond the recognized physician-patient

relationship."  Def. Reply 7.  The court does not find particularly persuasive the cases

cited by defendant in support of this proposition because the cases concern circumstances

where the relationships between the physician and plaintiff were considerably more

attenuated than in the case at bar (and, therefore, finding a duty of care would more

substantially increase physicians' potential liability).[9]  Nevertheless, the court

acknowledges Pennsylvania's policy that malpractice premiums must be kept to

reasonable levels.  The General Assembly clearly stated this policy in the Medical Care

Availability and Reduction of Error Act, P.L. 154, No. 13 (2002) (codified as amended,

40 Pa. Cons. Stat. §§ 1303.101-1303.910), declaring that "medical professional liability

---

[9] The cases cited are *Estate of Witthoeft v. Kiskaddon*, 733 A.2d 623 (Pa. 1999) (holding ophthalmologist not liable to victims of accident allegedly caused by patient's poor vision); *Hospodar v. Schick*, 885 A.2d 986 (Pa. Super. 2005) (holding neurologist not liable to victims of accident caused by patient's epileptic seizure); *Smith v. Linn*, 414 A.2d 1106 (Pa. Commw. 1980) (finding no doctor-patient relationship between physician who authored diet book and reader of the book); and *Fortino v. Stouffer*, 17 Pa. D. & C. 4th 526 (Pa. C.P. 1993) (holding under *Ervin* and *Craddock* that there was no doctor-patient relationship and therefore no liability where defendant's sole involvement in plaintiff's care was a single phone call from plaintiff's primary care physician during which defendant — who was plaintiff's former gynecologist —  agreed with the primary care physician's treatment plan).  *See* Def. Reply 7.

insurance has to be obtainable at an affordable and reasonable cost in every geographic

region of this Commonwealth" in order to maintain "[a]ccess to a full spectrum of

hospital services and to highly trained physicians in all specialties."  *Id*. § 1303.102(2)-

(3); *see also Wexler v. Hecht*, 928 A.2d 973, 985-87 (Pa. 2007) (Castille, J., dissenting)

(describing the 2002 act as "a response to a widely publicized perceived health care crisis

in Pennsylvania, which included an alleged fear on the part of medical practitioners that

malpractice insurance was becoming unaffordable resulting in some medical doctors

opting to leave practice in the Commonwealth").

It is clear, however, that the Commonwealth is also concerned with protecting

public health.  Indeed, in the Medical Care Availability and Reduction of Error Act just

mentioned, the General Assembly also declared it to be the policy of the Commonwealth

that "[e]very effort must be made to reduce and eliminate medical errors by identifying

problems and implementing solutions that promote patient safety" and that "[a] person

who has sustained injury or death as a result of medical negligence by a health care

provider must be afforded a prompt determination and fair compensation."  40 Pa. Cons.

Stat. §§ 1303.102(4)-(5).  And the Commonwealth regulates employers' use of the same

hazardous substances that triggered Dow Reichhold's obligation under OSHA to provide

its employees with annual physicals.[10]  Accordingly, the Pennsylvania Supreme Court has

---

[10] For example, in the Worker and Community Right-to-Know Act, P.S. 734, No.159 (1984) (codified at 35 Pa. Cons. Stat. § 7301 *et seq*.), the General Assembly declared it "the policy of the Commonwealth that employers within the Commonwealth and chemical suppliers doing business within the Commonwealth have a duty to make available to employees and to the

recognized duties of care in physicians where the public health is at risk.  For example, in

*DiMarco v. Lynch Homes-Chester County, Inc.*, 583 A.2d 422 (Pa. 1990), the court held

that two physicians were liable in negligence to the husband of a woman who was

accidentally stuck with a hepatitis-B-infected needle, and who was told by the physicians

that if she had no symptoms after six weeks, she was not infected and could resume

sexual relations.  Several months after she resumed sexual relations with her husband

following six weeks without symptoms, they both were diagnosed with hepatitis B.  The

husband sued in negligence, contending that the doctors should have warned his wife to

abstain from sexual relations for six months rather than only six weeks.  *Id*. at 423.  The

Pennsylvania Supreme Court found that "[w]hen a physician treats a patient who has been

exposed to or who has contracted a communicable and/or contagious disease, it is

imperative that the physician give his or her patient the proper advice about preventing

the spread of the disease"; that "the duty of a physician in such circumstances extends to

those 'within the foreseeable orbit of risk of harm'"; and that "[i]f a third person is in that

class of persons whose health is likely to be threatened by the patient, and if erroneous

advice is given to that patient to the ultimate detriment of the third person, the third

person has a cause of action against the physician."  *Id*. at 424 (emphasis omitted; quoting

*Doyle v. South Pittsburgh Water Co.*, 199 A.2d 875, 878 (Pa. 1964)).

─────────────────────

general public the identity of chemicals used in the workplace, and to make information available
as to the known or suspected health hazards posed by the use of or exposure to hazardous
substances."  The Act requires such disclosures for all substances deemed hazardous under
OSHA.  *See* 35 Pa. Cons. Stat. § 7303(a)(5).

Consideration of the five *Althaus* factors leads this court to the conclusion that the Pennsylvania Supreme Court would find that defendant Dr. Levine owed a duty of care to Mr. Ward.  Although there appear to be conflicting Pennsylvania policies at play with respect to the fourth and fifth *Althaus* factors — attempting to keep medical malpractice liability within reasonable limits while protecting public health and providing victims of physicians' negligence fair compensation — the other *Althaus* factors weigh decisively in favor of finding liability: (1) the relationship between Dr. Levine and Mr. Ward was similar to other radiologists' relationships to their patients, in that, although Dr. Levine did not interact with Mr. Ward directly, the purpose of his reading Mr. Ward's x-ray was to check for the presence of disease, at least in part for Mr. Ward's own benefit; (2) Dr. Levine's work as a certified B-reader, searching for signs of occupational dust and disease, serves an important social function in helping to detect disease in employees who work with hazardous substances; and (3) the risk of grave harm to a patient's health posed by negligence in reading x-rays is obvious.

Because the court predicts that the Pennsylvania Supreme Court — like the New Jersey Supreme Court — would find a duty owed by defendant Dr. Levine to Mr. Ward, there is no actual conflict between New Jersey law and Pennsylvania law with respect to whether Dr. Levine owed Mr. Ward a duty of care.  The court is therefore free to apply either state's law with respect to this particular issue, and defendant's motion for summary judgment on the ground that defendant had no duty to Mr. Ward under

22

Pennsylvania law will be denied.

**B.**

The second ground on which defendant moves for summary judgment is that "plaintiff's purported experts are not competent to testify regarding the applicable standard of care."  Def. Mot. 25.

In order to make out a prima facie case of medical malpractice under Pennsylvania law, a plaintiff is "required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered."  *Mitzelfelt v. Kamrin*, 584 A.2d 888, 891 (Pa. 1990).

Sitting in diversity, this court applies Pennsylvania law in determining the competence of an expert witness to testify.  *See* Fed. R. Evid. 601; *Miville v. Abington Mem'l Hosp.*, 377 F. Supp. 2d 488, 492 (E.D. Pa. 2005).  In order to testify to the standard of care under Pennsylvania law, an expert witness must have the following qualifications:

> (1)    Be substantially familiar with the applicable standard of care for the specific care at issue as of the time of the alleged breach of the standard of care.
>
> (2)    Practice in the same subspecialty as the defendant physician or in a subspecialty which has a substantially similar standard of care for the specific care at issue, except as provided in subsection (d) or (e).[11]

---

[11]  These exceptions are not apparently applicable here.  Subsection (d) provides that a court may waive the same-subspecialty requirement where "(1) the expert is trained in the diagnosis or treatment of the condition, as applicable; and (2) the defendant physician provided

> (3)     In the event the defendant physician is certified by an approved board, be
> board certified by the same or a similar approved board, except as provided
> in subsection (e).

40 Pa. Cons. Stat. § 1303.512(c).

Defendant contends that neither of plaintiffs' experts fulfills these requirements:

Dr. Andre Jawde is a cardiothoracic surgeon who — so far as his curriculum vitae reveals

— is not board certified in radiology, has no formal training in radiology, and has not

practiced radiology. *See* Def. Mot. 28-29 & Exh. D.  Dr. Jed Pollack's curriculum vitae

indicates that he is a therapeutic radiologist rather than a diagnostic radiologist. *See* Def.

Mot. 29-31 & Exh. F.  Plaintiffs respond that "Dr. Jawde routinely analyzes and interprets

chest x-rays and other radiographic studies as a surgeon who frequently removes the very

type of lung tumor that killed Mr. Ward" and point to the portion of Dr. Pollack's expert

report stating that "[t]he standard of care that applies to therapeutic radiologists is

identical to the standard of care that applies to general and/or diagnostic radiologists

under like and similar circumstances and like surrounding conditions."  Pl. Resp. 25.

The court notes that expert discovery has been stayed pending the court's decision

on defendant's motion for summary judgment, and neither expert has yet been deposed.

---

care for that condition and such care was not within the physician's specialty or competence."  40
Pa. Cons. Stat. § 1303.512(d).  Subsection (e) allows the court to waive the board certification
and same-subspecialty requirements "if the court determines that the expert possesses sufficient
training, experience and knowledge to provide the testimony as a result of active involvement in
or full-time teaching of medicine in the applicable subspecialty or a related field of medicine
within the previous five-year time period."  *Id*. § 1303.512(e).

On the limited record before the court on this motion, the court has some doubts as to Dr. Jawde's competence to testify to the standard of care under Pennsylvania's stringent requirements (as distinct from, for example, his competence to testify concerning the progress of Mr. Ward's cancer); however, Dr. Pollack's report and curriculum vitae appear to present sufficient evidence to suggest that he is competent to testify to the standard of care as a physician who is "board certified by . . . a similar approved board" and practicing "in a subspecialty which has a substantially similar standard of care for the specific care at issue."  40 Pa. Cons. Stat. §§ 1303.512(c)(2)-(3).  Accordingly, on the basis of the record as it now stands, defendant's contention that summary judgment should be granted on this ground will be rejected.

## C.

The third and final ground on which defendant moves for summary judgment is that plaintiffs have failed to file a certificate of merit, as required under Pennsylvania law. A plaintiff in a professional malpractice law is required to file "with the complaint, or within sixty days after filing the complaint, a certificate of merit signed by the attorney or the party" stating:

> (1)   an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or
>
> (2)   the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable

25

(3)      professional standard, or

             expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.

Pa. R. Civ. P. 1042.3.

Defendant apparently overlooked exhibit A to plaintiffs' complaint, an exhibit to which the complaint makes reference in paragraph 40.  As plaintiffs point out in their response to defendant's motion, exhibit A is an affidavit from Dr. Pollack averring, *inter alia*, that defendant deviated from the acceptable standard of care and that, "[t]o a reasonable degree of medical probability, had Dr. Levine complied with the standard of care on May 8, 2003, and thereafter, prior to the worsening and metastasis of Mr. Ward's lung cancer, Mr. Ward would have received timely surgical and/or therapeutic intervention to treat his cancer, thereby greatly increasing his likelihood of long-term survival."  Compl. Exh. A ¶¶ 23-24.

Although the affidavit is not signed by plaintiffs or counsel, the affidavit appears to fulfill in substance the criteria of Pa. R. Civ. P. 1042.3, and defendant has not provided the court with any reason why it should not be so regarded.  (Defendant's reply brief does not address this ground for defendant's motion.)  The court will therefore deny the motion for summary judgment on this ground.

## IV.

For the reasons stated above, the court will deny Dr. Levine's motion for summary judgment.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JUANITA WARD, et al.,

               Plaintiffs,

   v.

MOST HEALTH SERVICES, INC., et al.,

               Defendants.

Civil Action No. 06-4646

## ORDER

**AND NOW**, this 8th day of August, 2008, for the reasons stated in the foregoing opinion, defendant's motion for summary judgment, *see* Docket No. 48, is **DENIED**.

/s/ Louis H. Pollak

_____

Pollak, J.

27